IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| CHAD ADAMZAK, JAMES BERG, JAMES BROWN, SHAWN DALBEC, TONY FISH, CHASE HIRDLER, DAVID HOFSTRAND, MARK HOGAN, ALLEN JANOWICZ, NATHAN JOHNSON, LARRY JOHNSON, SCOTT KATZMAREK, NATHAN KRISAK, RILEY MALINOWSKI, EDWARD MEHTALA, STEVEN MURRAY, TONY PAYETTE, EDWIN PRIEM, GORDON SCHULTIES, DANNY SHAFFAR, ALAN STEGMANN, JACK SUNDVICK, SEAN TRUAX, GUY ROBERTS, and ZACHARY WOHLERS<br><br>    Plaintiffs,<br><br>v.<br><br>CAPSTAN CORPORATION, NORTHERN ENGINEERING COMPANY, LLC, and THE INTERLAKE STEAMSHIP COMPANY,<br><br>    Defendants. | Case No. 17 CV 638<br><br>**JURY DEMAND** |

## COMPLAINT AT LAW

In support of this complaint the plaintiffs state the following:

### SUBJECT MATTER JURISDICTION

1. This lawsuit arises out of lead poisoning and other injuries and damages suffered by the plaintiffs in the winter of 2015-2016, as a result of hazardous work conditions they were exposed to, including exposure to toxic lead and other occupational disease hazards, while working aboard the vessel HERBERT

C. JACKSON as it was dry-docked undergoing refurbishment at Fraser Shipyards, Inc. in Superior, Wisconsin.

2. The plaintiffs' injuries occurred while they were working aboard a vessel in the navigable waters of the United States. *See The Robert W. Parsons*, 191 U.S. 17, 34 (1903) ("[A]s all serious repairs upon the hulls of vessels are made in dry dock, the proposition that such repairs are made on land would practically deprive the admiralty courts of their largest and most important jurisdiction in connection with repairs."); *see also In re Complaint of Donjon Marine Co.*, 2008 U.S. Dist. LEXIS 59102, *10-11 (S.D. N.Y. 2008) ("injuries that occur in a dry dock [aboard a ship] have long been considered to occur on navigable waters")(collecting cases).

3. The plaintiffs' injuries have a maritime connection, because the toxic lead and chemical exposures are "of a sort with the potential to disrupt maritime commerce" and "the general character of the activity giving rise to the incident" shows a "substantial relationship to maritime activity." *See, e.g., Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 538-9 (1997); *Weaver v. Hollywood Casino-Aurora, Inc.*, 255 F.3d 379 (7th Cir. 2001); *Sweeney v. Saberhagen Holdings, Inc.* (*In re Asbestos Prods. Liab. Litig.*), 2011 U.S. Dist. LEXIS 13563, *13-16 (E.D. Pa. 2011).

4. Analogously, in *John Crane, Inc. v. Jones*, 274 Va. 581, 586-89, 650 S.E.2d 851, 853-55 (Va. 2007), the Supreme Court of Virginia explained:

> Applying the test enunciated in *Sisson* and *Grubart,* other courts have concluded that exposure to asbestos came within the general category of the risks of unsafe working conditions that have a potential impact on commercial shipping. In *Lambert v. Babcock & Wilcox, Co.,* 70

F.Supp.2d 877, 884 (S.D. Ind. 1999), the court observed that "[u]nsafe working conditions aboard a vessel have consistently been held to pose a potentially disruptive impact upon maritime commerce." The *Lambert* Court concluded that "asbestos exposure in the boiler room of a ship -- could potentially disrupt maritime commerce by rendering the boiler room too hazardous to operate." *Id. See also Bartel v. A-C Product Liability Trust,* 461 F.Supp.2d 600, 602 (N.D. Ohio 2006) (claim based on merchant seaman's exposure to asbestos while aboard a vessel was governed under admiralty law); *Weaver v. Hollywood Casino-Aurora, Inc.,* 255 F.3d 379, 386 (7th Cir. 2001) ("[W]ithout doubt an injury to . . . crew [of a "commercial boat"] disrupts its participation in maritime commerce."); *Alderman v. Pacific Northern Victor, Inc.,* 95 F.3d 1061, 1064 (11th Cir. 1996) ("Unsafe working conditions aboard a vessel under repairs, maintenance, or conversion, therefore, pose a potentially disruptive impact upon maritime commerce."); *Coats v. Penrod Drilling Corp.,* 61 F.3d 1113, 1119 (5th Cir. 1995) ("[W]orker injuries, particularly to those involved in repair and maintenance, can have a disruptive impact on maritime commerce by stalling or delaying the primary activity of the vessel.").

5. The plaintiffs' injuries are covered by the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950 ("LHWCA").

6. Section 905(b) of LHWCA states, in relevant part: "[i]n the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 33 of this Act [33 USC § 933] …. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this Act."

7. Section 933 of LHWCA states, in relevant part: "If on account of a disability or death for which compensation is payable under this Act, the person entitled to such compensation determines that some person other than the employer

3

or a person or persons in his employ is liable in damages, he need not elect whether to receive such compensation or to recover damages against such third person…. The right to compensation or benefits under this Act shall be the exclusive remedy to an employee when he is injured, or to his eligible survivors or legal representatives if he is killed, by the negligence or wrong of any other person or persons in the same employ: Provided, that this provision shall not affect the liability of a person other than an officer or employee of the employer." § 933 (a) and (i).

8. The claims for relief against The Interlake Steamship Company are expressly authorized by LHWCA § 905(b) and this statute makes clear that general admiralty and maritime law governs these claims.

9. The claims for relief against Northern Engineering Company, LLC and Capstan Corporation are permitted by LHWCA § 933 and brought pursuant to general admiralty and maritime law, or alternatively general admiralty and maritime law supplemented by state law, or alternatively applicable state law.

10. This court has subject matter jurisdiction over the claims for relief against The Interlake Steamship Company pursuant to 28 U.S.C. § 1333(1).

11. This court has subject matter jurisdiction over the claims for relief against Northern Engineering Company, LLC and Capstan Corporation pursuant to 28 U.S.C. § 1333(1) and 28 U.S.C. § 1367(a).

## IN PERSONAM JURISDICTION

12. Capstan Corporation is a Wisconsin Corporation engages in substantial activities within Wisconsin, committed tortious acts and/or omissions in Wisconsin, and entered into promises to perform services in Wisconsin. Therefore, this court has personal jurisdiction over this defendant pursuant to Wisc. Stat. § 801.05, subparagraphs (1)(c), (1)(d), (3), and (5).

13. Defendant Northern Engineering Company, LLC is a Wisconsin domestic limited liability company with its principal place of business in Wisconsin. The sole member of Northern Engineering Company, LLC is Fraser Industries, LLC, a Wisconsin domestic limited liability company with a principal place of business in Wisconsin. The sole member of Fraser Industries, LLC is Capstan Corporation, a Wisconsin corporation with its principal place of business in Wisconsin. Northern Engineering Company, LLC and its members engage in substantial activities within Wisconsin, committed tortious acts and/or omissions in Wisconsin, and entered into promises to perform services in Wisconsin. Therefore, this court has personal jurisdiction over this defendant pursuant to Wisc. Stat. § 801.05, subparagraphs (1)(c), (1)(d), (3), and (5).

14. Defendant The Interlake Steamship Company is a Delaware corporation that engages in substantial activities within Wisconsin, committed tortious acts and/or omissions in Wisconsin and entered into promises to perform services in Wisconsin. Therefore, this court has personal jurisdiction over this defendant pursuant to Wisc. Stat. § 801.05, subparagraphs (1)(d), (3), and (5).

## VENUE

15. The plaintiffs suffered great harm in this district and a substantial part of the events or omissions giving rise to the claims for relief set forth in this complaint occurred in this district. Therefore, this Court has venue pursuant to 28 U.S.C. §1391(b)(2).

## BACKGROUND FACTS

16. The HERBERT C. JACKSON is a 690' length overall Great Lakes bulk carrier ship that was originally built in 1959 to the order of The Interlake Steamship Company by Great Lakes Engineering Works.

17. The HERBERT C. JACKSON was originally equipped with steam turbine engines and many of the ship's surfaces were coated with lead-based paint.

18. The Interlake Steamship Company operates numerous bulk carrier commercial vessels on the Great Lakes.

19. In approximately 2006, with some of their ships in their fifth decade of service, The Interlake Steamship Company began to update its fleet as part of a 10-year modernization effort. This planned project included converting vessels from steam to diesel propulsion systems.

20. When work began on the repowering conversion of the HERBERT C. JACKSON started, it was The Interlake Steamship Company's fourth steam-to-diesel conversion since the 2006 modernization commenced.

21. In 2014, Capstan Corporation and Northern Engineering Company first became aware of the opportunity for a future steam-to-diesel conversion needed by The Interlake Steamship Company for the HERBERT C. JACKSON.

22. The opportunity for Capstan Corporation and Northern Engineering Company to land a project as large as the HERBERT C. JACKSON caused much excitement within Capstan Corporation and Northern Engineering Company.

23. Capstan Corporation, as well as Viant Crane, Fraser Shipyards, Inc. and Northern Engineering Company directed an "all hands-on deck" approach to the opportunity to capture the HERBERT C. JACKSON project. Preliminary planning began for submission of a proposal to The Interlake Steamship Company to obtain the contract for the conversion of the HERBERT C. JACKSON.

24. Capstan Corporation and Northern Engineering Company knew that performing the work aboard the HERBERT C. JACKSON in a cost-effective manner had great potential for profit. In order for Capstan Corporation and Fraser Shipyards, Inc. to become more competitive in the ship rebuilding industry, they needed to attract larger projects such as the HERBERT C. JACKSON. The initial planning meetings involved numerous personnel from Capstan Corporation, Viant Crane, Fraser Shipyards, Inc., and Northern Engineering Company. Included in these meetings were safety personnel from Capstan Corporation and business managers from Capstan Corporation.

25. From the time of the initial planning meetings in 2014 and thereafter, it was discussed as a focal point amongst representatives from Capstan

Corporation, Viant Crane, Fraser Shipyards, Inc., and Northern Engineering Company, that the work aboard the HERBERT C. JACKSON would inherently involve the potential exposure of workers to toxins, including lead.

26. Although the draft bids prepared by Capstan Corporation for the work aboard the HERBERT C. JACKSON contained line items for lead and toxin abatement, Capstan Corporation and others made the decision to "line-out" these safety provisions because they presented what they considered to be an unreasonable cost.

27. In 2015, The Interlake Steamship Company entered into contracts and/or agreements with Fraser Shipyards, Inc. and Northern Engineering Company, LLC, relating to the engine conversion and refurbishment of the HERBERT C. JACKSON. The contracts had penalties for delayed completion.

28. The work on the HERBERT C. JACKSON was to include the installation of diesel engines, a new gearbox and propeller system, exhaust gas economizers, and an auxiliary boiler, as well as new structural steel components.

29. Due to the risk of unavoidable danger from toxin exposure to workers aboard the HERBERT C. JACKSON if no actions were taken, certain safety personnel within Capstan Corporation made efforts to ensure that proper lead abatement and toxin avoidance were implemented aboard the HERBERT C. JACKSON. Notwithstanding, these efforts were ultimately quashed by Capstan Corporation business managers because of the added costs and potential for delay, which would result in payment penalties.

30. Prior to a single worker setting foot aboard the HERBERT C. JACKSON, defendants Capstan Corporation, and Northern Engineering Company knew that, without a doubt, workers were going to be exposed to toxins.

31. None of the workers were ever told they were going to be exposed to toxins. Instead, the presence of toxins was actively concealed from the workers by the defendants.

32. The failure to implement proper lead and toxin safety measures was not the first instance of misconduct that occurred with respect to the HERBERT C. JACKSON and involved profits taking precedence over safety.

33. In late 2015, the new diesel engines for the HERBERT C. JACKSON were being delivered to Fraser Shipyards, Inc. Due to the weight of these engines, a specialized 275-ton crane was needed to safely lift and unload the engines when they were delivered. Capstan Corporation, Todd Johnson, and Fraser Shipyards, Inc. were provided a quote for the use of a properly configured 275-ton crane, which they believed was too expensive. Rather than perform the lift with the correct crane and properly trained personnel, in order to save money Capstan Corporation and others attempted the lift with an improperly configured light-duty crane without properly trained personnel, in violation of numerous OSHA safety standards.

34. When the engine lift was attempted with the improper crane and improperly trained personnel, the steel cables on the light-duty crane failed and the engine fell to the ground.

35. As a result of this near-miss event, a large internal investigation took place that involved Capstan safety and management personnel, and Viant Crane representatives. The internal investigation resulted in a root-cause report being submitted to Capstan management personnel, detailing the failures in safety measures that led to the crane failure and near-miss event.

36. Rather than use the near-miss event and root-cause report as an opportunity to correct and implement safer practices, Todd Johnson and other Capstan Corporation representatives personally "red-lined" the report to minimize blame, divert responsibility, and to ensure the incident appeared to be a freak accident instead of conscious choices to risk safety for profits.

## PLAINTIFFS' LEAD EXPOSURE

37. The plaintiffs began working aboard the HERBERT C. JACKSON at Fraser Shipyards, Inc. in the winter and spring of 2016.

38. The plaintiffs performed work throughout different parts of the ship in the dry dock.

39. During this work the plaintiffs used or were around abrasive blasting tools and welding torches to blast, cut, chip, heat, and weld painted surfaces aboard the HERBERT C. JACKSON.

40. Plaintiffs had their blood lead levels tested and were all diagnosed with lead poisoning.

41. The plaintiffs' lead poisoning was a result of exposure to lead while working aboard the HERBERT C. JACKSON.

42. Lead poisoning has profound impacts on the health of human beings, affecting every one of the body's organ systems, especially the central nervous system, but also the kidneys, cardiovascular system, bones, digestive system and reproductive system. Symptoms of lead poisoning include, inter alia, headaches, abdominal pain, memory loss, mental processing speed, kidney failure, male reproductive problems, weakness, pain, insomnia, delirium, cognitive deficits, tremors, hallucinations, and convulsions. The plaintiffs have experienced many of these symptoms and are expected to continue experiencing these symptoms and other harm in the future.

## DEFENDANTS' NOTICE AND KNOWLEDGE OF THE DANGER

43. Unbeknownst to plaintiffs, but which each defendant either knew or should have known, was that surfaces of the ship where work was performed were covered in lead paint that, when blasted, cut, chipped, heated and/or welded, produced toxic fumes and airborne particulates.

44. For extended periods of time the plaintiff and others working on the HERBERT C. JACKSON were exposed to these fumes and airborne particulates, including, but not limited to, fumes and airborne particulates containing lead.

45. The defendants knew or should have known the plaintiff and other workers were being exposed to the hazards of occupational diseases, including, but not limited to, lead poisoning, in violation of federal, state and local regulations, industry safety rules, regulations, guidelines and procedures, and common sense.

46. As work progressed, complaints about the working conditions and negative health consequences were made to the defendants and their agents, including notice of unusual health ailments that were afflicting workers on the HERBERT C. JACKSON.

47. In addition to notice of the danger, on information and belief, the defendants, and each of them or any of them, also either actually knew of, or consciously and intentionally disregarded, the risk that workers refitting and refurbishing the nearly 60 year-old HERBERT C. JACKSON would be exposed to lead and other toxins without adequate protection.

48. The defendants, and each of them, had actual knowledge of the presence of lead paint on the HERBERT C. JACKSON.

49. Having been in existence since 1916 and holding itself out as a trusted and experienced vessel propulsion company for more than 100 years, Northern Engineering Company either knew or should have known of the dangers inherent in the refurbishment of ships, including the dangers of exposure to toxins such as lead on the HERBERT C. JACKSON, and how to protect workers from these dangers.

50. Capstan Corporation (formerly known as Reuben Johnson & Sons) and Northern Engineering Company have had actual knowledge of the dangers of lead exposure while refurbishing ships and how to protect workers from these dangers since at least 1993, when Fraser Shipyards, Inc., a related company they were working closely with at the time, was cited by OSHA for more than five-dozen safety

violations after failing to protect workers at its yard from exposure to toxic levels of lead.

51. Capstan Corporation and Northern Engineering Company, LLC should have known of the presence of lead paint and the high likelihood of unnecessary exposure of the workers to toxins including lead aboard the HERBERT C. JACKSON.

### DEFENDANTS' INADEQUATE RESPONSE TO THE DANGER

52. Instead of providing a safe place to work and taking appropriate steps to guard against exposure of the workers to lead and other toxins that the defendants knew or should have known were present, the defendants and their agents did nothing to effectively protect the plaintiffs and others laboring on the HERBERT C. JACKSON, ignored worker complaints, failed to investigate the widespread sickness and falsely assured workers there was nothing to be concerned about.

### OSHA SHUT DOWN THE JOB AND INVESTIGATED FRASER SHIPYARDS

53. In early 2016, as unusual health ailments progressed involving the workers refurbishing the HERBERT C. JACKSON, OSHA began an investigation.

54. This investigation was managed by OSHA'S Madison, Wisconsin office.

55. On or about March 29, 2016, OSHA halted the defendants' work aboard the HERBERT C. JACKSON due to unsafe working conditions including, but not limited to, dangerous exposure to lead.

56. As a result of the OSHA mandated work stoppage, the plaintiffs first learned they were exposed to dangerous levels of lead and other toxins during work on the HERBERT C. JACKSON, which caused them to obtain blood testing.

57. OSHA's investigation culminated in the issuance of 14 "willful egregious" health violations. This is the most dangerous OSHA classification. OSHA issued an additional five "willful" violations for failing to conduct monitoring to assess employee exposure to lead, failing to implement a lead compliance program or a respiratory protection program for lead and for failing to provide training on lead and asbestos hazards. Due to the nature of its investigation, OSHA did not investigate the conduct of Capstan Corporation, Northern Engineering Company or The Interlake Steamship Company.

## CLAIMS FOR RELIEF

58. The claims for relief against The Interlake Steamship Company are expressly authorized by LHWCA § 905(b) and this statute makes clear that general admiralty and maritime law governs these claims.

59. The claims for relief against Capstan Corporation, Todd Johnson, and Northern Engineering Company, LLC are permitted by LHWCA § 933 and brought pursuant to general admiralty and maritime law, or alternatively general admiralty and maritime law supplemented by state law, or alternatively applicable state law

60. It was the duty of the defendants, and each of them, to exercise reasonable care under the circumstances to protect the safety of the plaintiffs and others.

61. Notwithstanding this duty, the defendants, individually and collectively, were negligent and this negligence was a cause of the plaintiffs' lead poisoning and other injuries and damages, including past and future medical and health care expenses, past and future medical monitoring costs, past and future loss of earning capacity, pain, suffering, disability, disfigurement and severe emotional distress.

62. Under applicable law, it was also the duty of the defendants, and each of them, to refrain from conduct that is wanton, willful, outrageous, grossly negligent or morally reprehensible. *See e.g., Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 414 (2009)(recognizing "punitive damages have long been available at common law" and "the common law tradition of punitive damages extends to maritime cases"); *Summers v. Salmon Bay Barge Line, Inc.*, 2013 U.S. Dist. Lexis 157914, *32-33 (W.D. Wash. 2013)(holding the "common law rule allowing punitive damages applies" in claims under LHWCA §§ 905(b) and 933); *Callahan v. Gulf Logistics, LLC*, 2013 U.S. Dist. LEXIS 133050, at *1-10 (W.D. La. 2013)(same); *but see Exxon Mobil Corp. v. Minton*, 285 Va. 115, 134, 737 S.E.2d 16, 29 (Va. 2013)(reaching the opposite conclusion), *cert. den.* 133 S. Ct. 2812 (2013).

63. The defendants, and each of them, are guilty of conduct that is wanton, willful, outrageous, grossly negligent or morally reprehensible, rendering them, and each of them, liable for punitive damages, plaintiffs' attorney fees, costs and expenses.

64. For all of these reasons, the plaintiffs respectfully seeks the following:

(a) Judgment in favor of the plaintiffs, and each of them, and against the defendants, and each of them, for the full amount of the plaintiffs' compensatory damages plus costs;

(b) Judgment in favor of the plaintiffs, and each of them, and against the defendants, and each of them, for an award in addition to plaintiffs' compensatory damages for punitive damages, attorney fees, costs and expenses;

(c) Trial by jury on all issues triable by jury;

(d) Trial by advisory jury on all claims the Court believes should be tried in that fashion; and

(e) Such other and further relief as the Court deems appropriate under all of the facts and circumstances.

PLAINTIFFS DEMAND TRIAL BY JURY

CHAD ADAMZAK, JAMES BERG, JAMES BROWN, SHAWN DALBEC, TONY FISH, CHASE HIRDLER, DAVID HOFSTRAND, MARK HOGAN, ALLEN JANOWICZ, NATHAN JOHNSON, LARRY JOHNSON, SCOTT KATZMAREK, NATHAN KRISAK, RILEY MALINOWSKI, EDWARD MEHTALA, STEVEN MURRAY, TONY PAYETTE, EDWIN PRIEM, GORDON SCHULTIES, DANNY SHAFFAR, ALAN STEGMANN, JACK SUNDVICK, SEAN TRUAX, GUY ROBERTS and ZACHARY WOHLERS

By:   /s/ David E. Rapoport
         One of their attorneys

**Attorney for Plaintiffs**
David E. Rapoport, Wis. Bar No. 1025213
**RAPOPORT LAW OFFICES, P.C.**
20 North Clark Street, Suite 3500
Chicago, Illinois 60602
(312)327-9880
drapoport@rapoportlaw.com